**Appellant's Motion for Rehearing Overruled; Opinion of December 6, 2011 Withdrawn; Affirmed and Substitute Memorandum Opinion filed March 8, 2012.**



In The

# Fourteenth Court of Appeals

———————————

## NO. 14-10-00486-CR

———————————

## VICTOR AZIZ TORKIZADEH, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 268th District Court
Fort Bend County, Texas
Trial Court Cause No. 51353**

## SUBSTITUTE MEMORANDUM OPINION

We overrule Appellant's Motion for Rehearing, withdraw our opinion of December 6, 2011, and issue this opinion in its place.

A jury found appellant, Victor Aziz Torkizadeh, guilty of manslaughter. *See* TEX. PENAL CODE ANN. § 19.04 (West 2011). In addition, the jury found that appellant used a deadly weapon in the commission of the crime and assessed punishment at twenty years' confinement in the Institutional Division of the Texas Department of Criminal Justice. The trial court sentenced appellant in accordance with the jury's verdict. We affirm.

# I. FACTUAL AND PROCEDURAL BACKGROUND

Johnny Perez was twenty-two when he was killed on June 3, 2007. Perez had a learning disability and never finished high school. He also had a drug problem, regularly using Xanax and alcohol. Perez worked for his cousin, appellant, doing construction work, but not full-time. Instead, he worked an irregular schedule. Apparently he also received his wages irregularly. According to Perez's mother, appellant would pay Perez only when he wanted to pay him. Consequently, friction began to develop between Perez and appellant about a year before Perez's death. Perez's brother-in-law, Abel Delgado, testified the issue of money arose almost every time Perez worked for appellant. Delgado believed Perez accurately recalled the amounts that should have been paid during those discussions.

Eyewitnesses to the death of Perez include Perez's friend, Aldo Garcia; appellant; and appellant's wife, Amanda Lively. Garcia and Lively testified at trial and the jury heard appellant's statements made on 9-1-1 calls and to police officers.

## A. Garcia's Testimony

Garcia testified to the following. On Sunday, June 3, 2007, Perez told Garcia that appellant owed him money. Garcia picked Perez up at Perez's house. Perez called appellant on Garcia's cellular telephone and appellant told Perez to meet him at one of appellant's worksites near the intersection of Westheimer and Hillcroft. When Perez called appellant again, appellant told Perez he had moved to a different location. According to Garcia, appellant led them back and forth between appellant's jobsites for about thirty or forty minutes that Sunday afternoon.

Perez then thought appellant might be at his parents' home, so he had Garcia drive him there. Perez rang the doorbell at appellant's parents' house and determined appellant was not there. About five minutes later, appellant called Garcia, furious that Garcia had taken Perez to his parents' house. Appellant then told Garcia he was going to Garcia's

2

parents' house. Garcia then drove toward his parents' home, which was located off of Brand Lane. Garcia admitted he had taken two Xanax pills that day. According to Garcia, Xanax makes him relax, "like a beer or two."[1] Garcia denied that Xanax puts him in a rage or makes him hallucinate.

While driving on Brand Lane, Garcia saw a white van coming out of his parents' neighborhood that he thought was appellant's large white Chevrolet cargo van. Garcia drove past the neighborhood with appellant following two cars behind him. A short distance past the neighborhood, Garcia pulled into the parking lot of a veterinary clinic and parked in one of the spaces. According to Garcia, he pulled into the clinic so Perez could get his money from appellant. As Garcia entered the parking lot and stopped, Perez got out of Garcia's car and moved a few feet away. According to Garcia, appellant pulled into the parking lot behind Garcia and his van hit the rear of Garcia's car. Garcia testified the hit was not very hard and did not leave a mark on his car, but he definitely felt his car move after it was hit.

After the impact, Garcia testified appellant backed his van into the street and then drove forward hitting Perez with the middle front end of the van. According to Garcia, Perez was propelled under appellant's van and the van rolled over Perez. Appellant reversed the van and backed over Perez, then drove quickly down Brand Lane. Garcia testified his car never moved and he did not open the trunk of his car at any time during the entire incident.[2]

After appellant backed over Perez and departed the scene, Garcia called 9-1-1. Garcia went over to Perez lying on the ground. Garcia testified that Perez never got up

---

[1] Dr. Darshan Phatak, who performed Perez's autopsy, testified about the effects of Xanax. According to Dr. Phatak, Xanax is prescribed for pain relief and anxiety and has the same effect as alcohol. Dr. Phatak also testified that the autopsy of Perez did not detect any Xanax in Perez's body.

[2] Garcia testified he left his vehicle at the scene at the request of investigating police officers. Garcia's car appears in photographs taken of the scene by police, parked in a parking space in front of the clinic.

3

after he had been hit by appellant. Garcia testified Perez's eyes were rolling back into his head and he was mumbling. Garcia tried to talk to Perez, but he was unable to understand what Perez was trying to say. Emergency medical personnel arrived within ten minutes and started attending to Perez. The emergency medical personnel started an IV and asked Garcia to hold it and to continue talking to Perez. Eventually Perez was taken by helicopter to a hospital where he died. Garcia remained at the scene after Perez was taken to the hospital and talked with the police investigating the incident. Garcia eventually got a ride home with a neighbor.

Garcia testified that later that same evening, at about 8:16, he received a telephone call from appellant. Garcia knew Perez was dead when he received appellant's call. Garcia testified that appellant said he would give him $800 "just to keep his mouth shut." Appellant then told him to meet him at a nearby Burger King to get the money. Garcia did not go to the location; instead, he called the police and told them about the conversation.

Stafford police officer Chris Crum was the first police officer to respond to the scene at the clinic on Brand Lane. According to Crum, he was dispatched at 6:33 p.m.. Crum arrived at the scene after the emergency medical personnel. Crum found Garcia standing at the back of his vehicle, which was facing the clinic. Crum testified that Garcia "appeared in an almost shock-like state" and he was able to learn from him only that Perez was struck by a vehicle driven by Perez's cousin Victor and that Victor's girlfriend was in the vehicle at the time. Crum concluded Garcia was under "some emotional strain at that point" and appeared most concerned about Perez. Crum testified that he did not see any weapons or anything else on the ground.

## B. Appellant's Statements

Appellant made two calls to 9-1-1. Both recordings were played for the jury. In the first, which lasts only a few seconds, appellant told the 9-1-1 dispatcher that unnamed persons were coming at him with a baseball bat and that he had run over one of them. Appellant apologized. Appellant also stated the person he had run over was messed up on

4

drugs and appellant admitted to owing this person money. In the second call, appellant claimed that his employee was trying to beat him with a baseball bat. Appellant identified the person he had run over as his second cousin who had worked for him. Appellant told the 9-1-1 operator that Perez jumped out of the car he was riding in while it was still moving at about five miles per hour and that Perez approached appellant's van and began attacking it. Appellant also identified Garcia as the driver of the car. Appellant reported that the trunk of Garcia's car popped open, showing weapons. He told 9-1-1 that the driver of the other vehicle was trying to reverse and box him in and thus prevent his escape. Appellant said he hit the gas pedal and that he hit Perez, but it was unintentional. Appellant also reported that his wife, the mother of his children, was in the car with him and was his witness.

Detective Linda Roman of the Stafford Police Department was the investigating officer. Roman spoke with appellant on the telephone on June 4 and June 5, 2007. Both telephone interviews were played for the jury. In addition, Roman testified about her discussions with appellant. In the June 4 telephone conversation, appellant told Roman, "I didn't kill Johnny, I killed like the guy that was on these drugs." According to appellant, he and his wife, Amanda Lively, followed Garcia's car into the parking lot. Appellant told Roman he believed it was an ambush. In a quick sequence of events, appellant saw Perez jump out of Garcia's car while it was still moving, perhaps as fast as twenty or twenty-five miles per hour. Appellant told Roman that Perez took a violent fall and possibly broke a bone when he hit the ground. Appellant said he almost hit Perez at that point. Next, Garcia slammed on the brakes and appellant, unable to stop in time, hit the back of Garcia's car. According to appellant, Garcia then got out of his car and opened the trunk. Appellant told Roman that Perez was going for some tools and then, like a wild animal, was "all over" appellant's van. Appellant also told Roman that Garcia, now back in his car, was trying to box appellant in. Appellant then told Roman that as he tried to get out of the parking lot, he turned his wheel and Perez went under the front tire. Appellant told Roman he believed it was the left front tire. Appellant also said he started

5

from a standstill and he was not even going ten miles per hour when he hit Perez. Appellant said he had to leave the scene because Garcia was still after them.

In the June 5 interview, Roman asked appellant if he was going to come in to the police station to give a statement. Appellant, despite agreeing to do so, never came to the police station to give a statement or provide a diagram of what happened in the parking lot.

Also in the second interview, appellant again recounted the events of June 3. Appellant told Roman that Perez and Garcia had a plan and Garcia was trying to box him in with his car. Appellant also said it was Garcia who reversed and hit his van and that Garcia's trunk popped open. Appellant told Roman he could see a baseball bat, a tire iron, a jack, and a golf club or a pole in Garcia's open trunk. Appellant also said he was probably looking at Garcia and he did not realize that he had hit Perez. Despite telling Roman he did not realize he had hit Perez, he also told her that he felt it when he ran over his cousin. Later in the interview, appellant told Roman he was looking at Perez when Garcia backed into his van. Appellant also told Roman he had seen the dent in the bumper of his van made by Garcia's vehicle. Appellant told Roman he saw Perez laying on the ground in his rearview mirror. Later in the interview, appellant told Roman he was not certain if he had seen Perez on the ground in his rearview mirror. Instead, he said Lively told him that she saw Perez get up off of the ground and throw his hands up as if to "flip off" appellant.

## C.    Amanda Lively's Statements and Testimony

Lively told Detective Roman that appellant followed Garcia and Perez into the parking lot. Lively saw Perez get out of Garcia's car before it stopped moving. Lively thought Perez retrieved something from the trunk of Garcia's car, then moved toward her side of the van and started kicking it. Lively then told Roman that appellant stopped his van, put it in park, and told Perez he was there to pay Perez the $60.00. Lively said that Perez was acting crazy and that she told appellant to leave. Appellant reversed the van as, according to Lively, Garcia had done a 360-degree turn to either leave the parking lot or

6

come at the van. Appellant then started forward and Perez ran at the van again. According to Lively, that was when appellant ran over Perez.

Lively also testified at trial. Lively told the jury that she and appellant were home watching a movie when Perez started repeatedly calling appellant demanding that he be paid $60.00. Appellant eventually agreed to meet Perez and pay him the money. Lively explained they were driving to meet Perez when they saw Garcia and Perez in Garcia's car driving on Brand Avenue. Garcia and Perez motioned for appellant to follow them and they eventually turned into the veterinary clinic. Appellant was following Garcia into the parking area when Lively saw Perez open the car door and tumble out of Garcia's car while it was still travelling at about 15 miles per hour. Lively testified that Perez hit his whole front side, including his face and arms, on the pavement. At the same time, Lively testified, Garcia released his trunk and she saw numerous items inside the trunk, including a baseball bat. Despite having hit the pavement, Perez got up and began attacking the passenger side of appellant's van. At that point, according to Lively, Garcia backed up his car, hitting appellant's van. Lively testified that Garcia could easily have hit Perez because Perez was standing on the van's front bumper. However, Lively testified that she did not see either appellant or Garcia hit Perez. In fact, Lively testified that appellant did not run over Perez. Lively testified she believed Garcia was trying to block them from leaving the parking lot. However, despite Garcia's efforts, appellant was able to drive out of the parking lot. Lively also testified that, as a result of appellant's maneuvers in the parking lot, tools and other items from the back of the van were flying around and moving. Lively testified she checked to see if Garcia was following them and when she did, she "noticed [Perez] on the ground and lifting his hand up. I think he was trying to get up."

### D.    Cause of Death

Dr. Darshan Phatak was the assistant medical examiner who performed Perez's autopsy. In Dr. Phatak's opinion, the cause of death was "multiple blunt force injuries" and death from internal bleeding would have occurred in less than five minutes. Perez

7

would have been "in excruciating pain and unable to move, and as his brain is not receiving any blood any longer, he would lose consciousness and die."

Dr. Phatak testified that Perez's body had various scrapes and contusions but none was severe enough by itself to cause Perez's death. Dr. Phatak's internal examination revealed a large amount of blood in the lung cavities, the pericardial sac, and the peritoneal cavity. According to Dr. Phatak, there is not supposed to be any blood in these locations. Dr. Phatak testified that, as a result of this internal bleeding, the blood was removed from Perez's circulatory system and his brain and organs were not receiving oxygenated blood and that death occurred as a result.

Dr. Phatak also testified about other internal injuries Perez suffered. According to Dr. Phatak, Perez had fractured ribs on both sides of his back, and his lungs had been perforated by his ribs. In addition, both lungs had multiple contusions or bruises on the back side. According to Dr. Phatak, Perez was hit by sufficient force to "jar the lung and give it contusions along its back." Perez was hit "hard enough to tear a blood vessel entering the heart from the heart completely and fill the pericardial sac with blood." Perez also had diffused contusions surrounding the pylorus or the end of his stomach. Perez's kidneys were also damaged and his liver had multiple tears and the liver itself had torn free from the tube housing it in Perez's body. In addition, the exposed liver tissue was crushed. According to Dr. Phatak, the injuries to Perez's liver were, in and of themselves, immediately fatal.

Perez's pelvis had a vertical fracture that completely transacted or broke the left innominate bone, which is the major bone of the pelvis. Perez's right femur was broken and had been displaced, causing Perez's right leg to appear two inches shorter than his left leg. Dr. Phatak testified that Perez would not have been able to stand with a broken femur and, given the extent of his injuries, he would not have been making any voluntary movements or "reacting in any way whatsoever." In other words, Perez could neither

have sustained these injuries from rolling out of the car nor gotten up off the ground to attack appellant as described by Lively.

Perez's spine was intact. Dr. Phatak ruled out the possibility of a tire rolling on Perez's back on the basis of the presence of a single hematoma in Perez's back. This hematoma measured four inches by two inches wide and the fat surrounding it was intact. In addition, there were no tire marks on Perez's body or clothing. Dr. Phatak also testified that this hematoma, and its location on Perez's body, is consistent with Perez being struck from behind.

Finally, Dr. Phatak, based on his experience performing autopsies on other auto-pedestrian accident victims, estimated that Perez was hit by a vehicle moving at least fifteen and no more than forty miles per hour.

E.    The Van Testimony

In his June 4 interview with Detective Roman, appellant encouraged Roman to immediately pick up his van, as he believed she would find Perez's fingerprints and shoe prints all over it. Appellant mentioned the possibility of rain and the need to get the van before it rained. Roman had the van towed from appellant's father's house that same day. Police checked the van for fingerprints and shoe prints. The police found a single latent fingerprint that was not readable. Roman testified there are normally fingerprints all over a vehicle because people are constantly using them. In addition, the police found a single shoe print, which did not match the shoes Perez was wearing when he was killed. The police also searched the van's undercarriage for hairs, fibers, and similar items, but found none that would connect the van to the incident.

The van was subjected to additional tests in March 2010 by Sergeant Paul Adkins of the Texas Department of Public Safety. Adkins is a member of the State Crash Reconstruction Team. Adkins found the van to be weathered but otherwise in good shape. He noted no dents, scratches, cuts, or rust spots of any consequence. Adkins found this to

be noteworthy because vans that have been involved in a collision with a pedestrian normally suffer some kind of visible hood or windshield damage.

Adkins also tested the van for acceleration and braking. Adkins noted that the van, a work van, had shelving in the back. When Adkins did the first test run involving non-standard driving such as rapid acceleration and braking, a lot of debris flew off the shelves. Adkins testified he found this "unusual for a van that was involved in any sort of vehicular crime." As a result of his testing, Adkins concluded the van could reach forty miles per hour and come to a stop in the clinic parking lot.

Adkins also retrieved the van's airbag control module.[3] The data from the module suggested that the driver's side airbag in the van had deployed at some point in time but the passenger airbag had not because it did not register anyone sitting in that seat at the time. Unlike any other module Adkins had seen, this module continued to record key or ignition cycles after the driver's side airbag deployed. According to Adkins, the module recorded eight key cycles. Adkins determined that the van had an intact driver's side airbag and steering wheel. Adkins found this unusual because it indicated that the airbag and steering wheel had been replaced, but the module had not. Adkins concluded that the van he tested had not hit anyone, and therefore did not cause Perez's death.

As a result of Adkins' tests, Roman came to the conclusion that she had been given the wrong van. Roman then investigated the vehicles owned by appellant, appellant's father, appellant's stepmother, and appellant's mother. Roman found that, in addition to the 2002 van that she had picked up in June 2007, appellant's family had also owned a 2003 Chevrolet cargo van. Based on her check of the records, the 2003 van could have been purchased or had its title issued on April 1, 2007. Roman determined the van had been wrecked in 2009 and then it had been sold to a woman living in Manville. She then travelled to Manville where she was told the woman had moved to Louisiana and the van

---

[3] The control module was also referred to as the van's "black box."

10

was located in a salvage yard. Roman went to the salvage yard and took photos of the 2003 van. According to Roman, the 2002 and 2003 vans looked very similar. Both were white, work-type Chevy vans without windows on the sides. In addition, they were the same length. Roman determined that the 2003 van used to have a front grill that was removed as a result of the 2009 accident. On cross-examination, Roman admitted she did not know the exact date on which appellant's family acquired title to the 2003 van.

Several witnesses testified about the appellant's vans. Georgia Perez, Perez's sister, testified that appellant had three vans. Georgia testified that two of the vans were white and looked the same. According to Georgia, the third van looked different from the other two and was a yellowish-white color. Georgia admitted she had never seen the two white vans together, and she based her conclusion on a statement by appellant that he had purchased a new white van.

Garcia testified that appellant owned only a single van when Perez was killed. Gabriel Perez, appellant's best friend and cousin, testified that appellant did not have two vans when Perez was killed. Cesario Martinez, who testified he was best friends with appellant, also testified that appellant had only one van on June 3, 2007. On cross-examination, Martinez testified the only van appellant had at that time was a 2003 Chevrolet van and that was the van involved in the incident. Lively also testified appellant had only one van on June 3, 2007. Rudolph Perez testified that he had known both appellant and Perez and had helped raise them. Rudolph testified that, on June 3, 2007, appellant had only a single van and that he never owned two at the same time.

Appellant's father, Sayed Torkizadeh, testified about the number of vans used by appellant. Torkizadeh testified that appellant was unable to purchase any vehicles on his own. As a result, Torkizadeh testified that he purchased four vehicles for his son: a car and three vans. The first van he purchased was a 2001 Chevrolet van that was totaled in 2006. To replace the totaled van, Torkizadeh purchased a 2002 Chevrolet cargo van. This was the van that Roman picked up on June 4, 2007. Finally, Torkizadeh purchased a

11

white 2003 Chevrolet van on July 16, 2007. That van was in an accident and was totaled in June of 2009. In addition, Torkizadeh testified appellant had only a single van on June 3, 2007, the white 2002 van. On cross-examination, Torkizadeh testified that he had worked for years as a car salesman. In addition, Torkizadeh testified that the 2002 and 2003 vans looked the same.

## II. DISCUSSION

Appellant raises four issues on appeal. We address each issue in turn.

### A. Sufficiency of the evidence

In his first issue, appellant contends the evidence adduced at trial by the State was insufficient to support his conviction. We disagree.

### 1. Standard of review

In a sufficiency review, we view all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Salinas v. State*, 163 S.W.3d 734, 737 (Tex. Crim. App. 2005). The jury, as the sole judge of the credibility of the witnesses, is free to believe or disbelieve all or part of a witness's testimony. *Jones v. State*, 984 S.W.2d 254, 257 (Tex. Crim. App. 1998). The jury may reasonably infer facts from the evidence presented, credit the witnesses it chooses to, disbelieve any or all of the evidence or testimony proffered, and weigh the evidence as it sees fit. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). Reconciliation of conflicts in the evidence is within the jury's discretion, and such conflicts alone will not call for reversal if there is enough credible evidence to support a conviction. *Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986). An appellate court may not re-evaluate the weight and credibility of the evidence produced at trial and in so doing substitute its judgment for that of the fact finder. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). Inconsistencies in the evidence are resolved in favor of the verdict.

12

*Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000). We do not engage in a second evaluation of the weight and credibility of the evidence, but only ensure the jury reached a rational decision. *Muniz v. State*, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993); *Harris v. State*, 164 S.W.3d 775, 784 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd).

## 2.    Discussion

The elements of the offense of manslaughter are as follows: (1) the defendant; (2) recklessly; (3) caused the death of an individual. Tex. Penal Code Ann. § 19.04(a).

> A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

*Id.*, § 6.03(c).

> Appellant was charged with manslaughter and the jury was instructed:

> Now, if you find from the evidence beyond a reasonable doubt that on or about June 23rd, 2007, in Fort Bend County, Texas, the defendant, Victor Ariz Torkizadeh, did then and there recklessly, to wit: by failing to keep a proper lookout for pedestrians while operating a motor vehicle, and/or while operating a motor vehicle fail to yield right of way, and/or fail to control a motor vehicle as necessary to avoid striking Johnny Perez, cause the death of an individual, namely Johnny Perez, by striking Johnny Perez with a motor vehicle, then you will find the defendant guilty of Manslaughter as charged in the indictment.

Thus, the State alleged three manners and means by which appellant acted recklessly, each of which was pleaded in the conjunctive/disjunctive. When the trial court's charge authorizes the jury to convict on several different theories, as it did here, the verdict of guilty will be upheld if the evidence is sufficient on any one of the theories. *Swearingen v. State*, 101 S.W.3d 89, 95 (Tex. Crim. App. 2003).

13

When viewed in the light most favorable to the verdict, we conclude the evidence is sufficient to support appellant's conviction. First, the jury heard Dr. Phatak's testimony that Perez died as a result of multiple blunt force injuries and his opinion that Perez was struck by an automobile moving at least fifteen miles per hour and no more than forty miles per hour. In addition, the jury heard appellant's admission in his 9-1-1 call that he had hit and run over Perez. Appellant also admitted that, in his efforts to get away from the veterinary clinic, his foot hit the gas pedal and he unintentionally hit Perez. In addition, in his June 4 telephone interview with Roman, appellant told Roman that, as he tried to get out of the parking lot, he turned the wheel of his van and Perez went under his front tire. Appellant told Roman he started from a standstill and was not even going ten miles per hour when he hit Perez. In addition, the jury heard Roman's interview with appellant's wife. In her statement, Lively told Roman that appellant ran over Perez as he drove forward in an effort to leave the veterinarian clinic parking lot. We hold that, based on this evidence, a rational jury could have found beyond a reasonable doubt that appellant failed to keep a proper lookout for pedestrians while operating a motor vehicle or failed to control a motor vehicle as necessary to avoid striking Perez.

Appellant also asserts that the evidence is insufficient because Adkins opined that the 2002 Chevrolet van turned over to the police on June 4, 2007 was not the van that caused Perez's death. Appellant points to the testimony indicating that appellant owned only a single van on June 3, 2007. According to appellant, this evidence establishes that appellant did not cause Perez's death. We disagree. First, the jury could have reasonably believed Roman's testimony that appellant's family owned a second van in June 2007. In addition, the jury could have disbelieved each of the witnesses who testified appellant owned or had access to only a single van in June 2007. Finally, as noted above, appellant admitted to hitting Perez with a vehicle—it does not matter what vehicle he used.

Because the evidence is sufficient to support appellant's conviction, we overrule appellant's first issue on appeal.

14

**B.      Appellant's request to remove juror Roberts**

In his second issue on appeal, appellant contends the trial court erred when it refused to remove Sarah Roberts from the jury when it was discovered that she was distantly related by marriage to Perez.   In his related third issue, appellant asserts the trial court erred when it refused to allow him to testify for the limited purpose of establishing a bias or prejudice that would prevent Roberts from serving on the jury.

**1.      Background**

Roberts was selected to serve on the jury hearing appellant's case.   After the jury heard the indictment, appellant's not guilty plea, and the State's opening statement, Roberts asked to speak to the trial court.   Roberts informed the judge that she thought that Perez was her nieces' uncle.   Roberts explained she only came to that conclusion after seeing Cynthia Talamantez, Perez's sister, in the courtroom.   The trial court recessed the jury and conducted a hearing on the matter.

Both Roberts and Talamantez testified during the hearing.   They confirmed that Talamantez was Perez's sister and Talamantez's ex-husband's brother is Roberts' husband.   Talamantez and her ex-husband have daughters, the nieces Roberts was referring to when she approached the trial court.   In response to further questioning, Roberts testified that she did not know about appellant's case, would listen to the facts, and would not allow her knowledge of Perez's family to color her judgment.   Roberts also testified that she did not know Perez or appellant.   In addition, Roberts testified that while she still sees her nieces, she has no contact with other members of Perez's family.   The trial court denied appellant's request to remove Roberts from the jury.

After a short recess, appellant's attorney approached the bench and said:

> I have just learned some information from my client that might shed some light on the relationship between [the juror] and him.

15

She was present at a wedding where my client was, and there was an argument there at that wedding and I would appreciate the opportunity to have my client testify in regards to that.

The trial court denied appellant's request, saying:

It will open all—if you are ready to open the door to everything, he can testify. Your request is denied.

Well come back up. Come back up here.

Any testimony from your client in this regard is going to be self serving at the very best and the court will not accept that. And you have not shown any timeframe, whether it's remote in time or close in time or that this juror witnessed that, so I can't lend any credence to that based on what you have told me.

Now if you bring me more information, we will revisit it later.

The trial court gave appellant the opportunity to develop his proffer the next morning. The trial court then told appellant, "I'm not inclined to address this matter further unless you can show me cause to do so now." Appellant's attorney responded: "Okay, right now I have gone through the facts and right now I don't have anything further." The issue did not come up again.

## 2. Challenge for cause of juror Roberts

A defendant can challenge any juror for cause on the basis that the juror is related within the third degree of consanguinity or affinity, as determined under Chapter 573 of the Government Code, to the person injured by the commission of the offense. TEX. CODE CRIM. PROC. ANN. art. 35.16(c)(1) (West 2006). On appeal, appellant concedes that Roberts does not fall within the third degree of consanguinity. Therefore, we conclude that the trial court did not err when it rejected appellant's request to remove Roberts from the jury based solely on her relationship to Perez.

We turn next to whether the trial court erred when it refused appellant's request to remove Roberts because she was actually biased. The decision to remove or retain a juror

16

lies within the sound discretion of the trial court. *Uranga v. State*, 330 S.W.3d 301, 307 (Tex. Crim. App. 2010).

Appellant relies on the case of *Stockton v. State* in support of his contention that the trial court abused its discretion when it refused to remove Roberts from the jury. *Stockton v. State*, 187 S.W.2d 86 (Tex. Crim. App. 1945). In *Stockton*, the defendant was convicted of capital murder for the shooting of a prison guard. *Id.* at 87. Prospective juror Ellington revealed during voir dire that he had known the deceased prison guard for twenty-five years and had been his neighbor for many years. *Id.* at 88. Ellington further stated that he knew the guard's wife, and that one of his nephews had married the deceased guard's daughter. *Id.* The defendant's challenge for cause was denied and the defendant was forced to use a peremptory strike on Ellington. *Id.* The Court of Criminal Appeals found that the trial court should have sustained the challenge for cause. *Id.* The court then found that the defendant, having exhausted his peremptory strikes, was forced to accept prospective juror Stutts, whose uncle worked at the same prison where the guard had been killed. *Id.* at 88–89. Stutts's uncle was one of the people the defendant had held in his charge and had threatened with death during the incident. *Id.* at 89. The court held that the defendant's challenge for cause to Stutts should have been sustained, and that the reason the defendant did not have a peremptory strike to use on Stutts was the denial of the earlier challenge for cause to Ellington. *Id.* at 90.

On motion for rehearing, the State challenged the court's determination that Stutts should have been removed for cause. *Id.* at 90. The court reasoned that Stutts was not disqualified because of his relationship to just any witness, but to an interested party in the prosecution. *Id.* In addition, the court emphasized that the challenge for cause to Ellington should have been sustained not only because of his relationship by marriage but also on account of his long acquaintance with the deceased prison guard. *Id.*

We conclude that *Stockton* is distinguishable. Here, Roberts testified that, to her knowledge, she had never met Perez; in *Stockton*, Ellington had known the prison guard for

17

many years. In addition, Roberts' testimony revealed that she was married to Perez's sister's ex-husband's brother and is not related by blood to Perez. Also, Perez's sister and her daughters were not parties to the case and were not witnesses. While Roberts still visits her nieces, she has no other contact with Perez's family. Roberts testified that her nieces mentioned Perez by name just once. Roberts testified that, before voir dire, she had not heard about what had happened to Perez. Finally, Roberts unequivocally testified that she could be unbiased. We hold that the trial court did not abuse its discretion when it determined Roberts was not actually biased. We overrule appellant's second issue.

## C. Appellant's request to testify regarding Juror Roberts without waiving his Fifth Amendment rights

In his third issue, appellant contends the trial court erred when it denied his request that he be allowed to "testify and explain to the judge exactly when and how he and Roberts had crossed paths." Appellant contends on appeal that his testimony "would have been in direct conflict with Roberts' testimony that she had never met appellant." Appellant "asked to testify and provide relevant evidence on the limited issue of Roberts's bias or prejudice without waiving his Fifth Amendment privilege and opening himself up to questioning by the prosecutor on all matters relevant to trial." Appellant argues that he had the right to testify on this limited issue without opening himself up to questioning about the facts of the case. *See Crosson v. State*, 36 S.W. 3d 642, 645 (Tex. App.—Houston [1st Dist.] 2000, no pet.); TEX. R. EVID. 104(d) (the accused in a criminal case does not, by testifying upon a preliminary matter out of the hearing of the jury, become subject to cross-examination as to other issues in the case). He argues that this is constitutional error, requiring reversal unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. *See* TEX. R. APP. P. 44.2(a).

It is unclear from this record whether the trial court was requiring appellant to waive his Fifth Amendment right. While, at first, the trial court did seem to so rule, he also seemed to reconsider the point, asking for more information from appellant's counsel.

Assuming that the trial court did rule that appellant would waive his Fifth Amendment right by testifying to his knowledge about the juror, this would have been error. However, in order for that error to have been harmful and require reversal, the excluded evidence must have been sufficiently described through an offer of proof. *See Mays v. State*, 285 S.W.3d 884, 889–90 (Tex. Crim. App. 2009). While appellant's counsel did state that the juror and appellant were both at a wedding and that an argument occurred at this wedding, he did not inform the trial court of the details of that event. The trial court told appellant's counsel that he had not provided the trial court sufficient information to determine the relevance of the proposed evidence—the trial court wanted to know when this occurred and whether the juror heard the argument. In addition, the next morning, the trial court gave appellant's counsel an opportunity to further develop his proffer. In response to that offer, appellant's attorney said: "Okay, right now I have gone through the facts and right now I don't have anything further." Therefore, we conclude that appellant failed to meet the requirement that an offer of proof must inform the trial court of the actual content of the proposed testimony, facilitating a reviewing court's determination of its admissibility. *See* TEX. R. APP. P. 33.1(a)(1)(B); *Love v. State*, 861 S.W.2d 899, 900–01 (Tex. Crim. App. 1993).

Assuming appellant's offer of proof was sufficient, we nevertheless find the error harmless. Appellant would have testified that he met Roberts at a wedding and that there was an argument at the wedding. Roberts, however, denied meeting appellant. She also testified that she could be fair and unbiased. The trial judge would not abused his discretion in overruling appellant's challenge to the juror, and declaring a mistrial, as that testimony would not have conclusively proved that Roberts was actually biased. *See Uranga v State*, 330 S.W. 3d at 306-307 (no abuse of discretion in denying a mistrial when

19

seated juror was a victim of an extraneous offense committed by the defendant but stated he would be fair and unbiased); *Decker v. State*, 717 S.W. 2d 903, 907 (Tex. Crim. App. 1983) (no abuse of discretion in not removing juror who knew the complainant, where juror did not intentionally fail to reveal the information in voir dire).

Importantly, this information was presumably known to appellant during voir dire, given that claims that he knew Roberts from an encounter at a wedding. Appellant had the opportunity to see the jurors and assist his counsel during jury selection. If this information had been important, appellant's counsel could have questioned the juror during voir dire or used a peremptory strike on the juror. Because appellant did neither, we conclude beyond a reasonable doubt that any error by the trial judge did not contribute to the conviction or punishment. We overrule appellant's third issue.

## D.    Ineffective assistance of counsel

In his fourth issue, appellant asserts he received ineffective assistance of counsel because he argues his trial counsel failed to object to Roman's testimony about the 2003 Chevrolet cargo van.

### 1.    Standard of review

In reviewing claims of ineffective assistance of counsel, we apply a two prong test. *See Salinas*, 163 S.W.3d at 740 (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984)). To establish ineffective assistance of counsel, appellant must prove by a preponderance of the evidence that (1) his trial counsel's representation was deficient in that it fell below the standard of prevailing professional norms, and (2) there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. *Id.*

An accused is entitled to reasonably effective assistance of counsel. *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983). However, reasonably effective assistance of counsel does not mean error-free representation. *Ex parte Felton*, 815 S.W.2d 733, 735

(Tex. Crim. App. 1991). When evaluating a claim of ineffective assistance, the appellate court looks to the totality of the representation and the particular circumstances of the case. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). There is a strong presumption that counsel's actions and decisions were reasonably professional and were motivated by sound trial strategy. *Salinas*, 163 S.W.3d at 740; *Stults v. State*, 23 S.W.3d 198, 208 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). To overcome the presumption of reasonable professional assistance, "any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Thompson*, 9 S.W.3d at 814.

When determining the validity of an ineffective assistance of counsel claim, any judicial review must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ingham v. State*, 679 S.W.2d 503, 509 (Tex. Crim. App. 1984). When the record is silent as to the reasons for trial counsel's conduct, a finding that trial counsel was ineffective would require impermissible speculation by the appellate court. *Stults*, 23 S.W.3d at 208. Absent specific explanations for counsel's decisions, a record on direct appeal will rarely contain sufficient information to evaluate an ineffective assistance claim. *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). When trial counsel has not had an opportunity to explain his or her actions or inactions, an appellate court cannot find deficient performance unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005).

If a criminal defendant can prove trial counsel's performance was deficient, he still must prove he was prejudiced by his counsel's actions. *Thompson*, 9 S.W.3d at 812. This requires the defendant to demonstrate a reasonable probability that the result of the proceeding would have been different if the trial counsel had acted professionally. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Malett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001).

21

## 2. Analysis

To overcome the presumption of reasonable professional assistance, any allegation of ineffectiveness must be firmly founded in the record and the record must affirmatively demonstrate the alleged ineffectiveness. *Thompson*, 9 S.W.3d at 813. Appellant did not file a motion for new trial. In addition, appellant's trial counsel was not afforded the opportunity to explain his decisions or trial strategy.

Trial counsel, in a motion in limine and in a bench conference, argued that Roman's testimony about the 2003 Chevrolet van was inadmissible hearsay. The court overruled the motion and stated in the bench conference that the testimony was admissible as part of Roman's investigation. Trial counsel did not object again when Roman testified. In a reversal of roles, the State argues that trial counsel preserved error while appellant argues that trial counsel did not.

Assuming appellant's trial counsel's conference at the bench did not preserve error, there is no direct evidence in the appellate record of his reasons for not renewing those objections when Roman actually testified regarding the 2003 van. It is possible that trial counsel could have elected not to object because he had numerous witnesses lined up to testify that appellant owned only a single van on June 3, 2007 and thought that this evidence might challenge the credibility of the State's case against appellant in general. Regardless, without speculation, we cannot determine whether counsel's representation of appellant fell below the objective standard of professional representation. In the absence of a record identifying the reasons for trial counsel's actions, we must presume they were made deliberately and as a part of a reasonable trial strategy. *See Stults*, 23 S.W.3d at 209. And, as discussed above, it does not matter what vehicle appellant was driving when he hit Perez—what matters is the extensive testimony that appellant indeed hit Perez with a vehicle. Therefore, there can be no harm from the admission of this testimony. We overrule appellant's fourth and final issue on appeal.

## III.  CONCLUSION

Having overruled each of appellant's issues, we affirm the trial court's judgment.

/s/      Tracy Christopher
Justice

Panel consists of Justices Seymore, Brown, and Christopher.

Do Not Publish — TEX. R. APP. P. 47.2(b).